[931 NYS2d 559]

Magen David of Union Square et al., Appellants, v 3 West 16th Street, LLC, Defendant/Third-Party Plaintiff-Respondent. Steven J. Ancona, Third-Party Defendant-Appellant.

First Department, September 29, 2011

## APPEARANCES OF COUNSEL

*Hughes Hubbard & Reed LLP*, New York City (*Christopher M. Paparella, William J. Sanchez, Andrea Engels* and *Meaghan Gragg* of counsel), for appellants.

*Hartman & Craven LLP*, New York City (*Edward A. White* and *Michael P. Reagan* of counsel), for respondent.

## OPINION OF THE COURT

CATTERSON, J.

The resolution of this long-simmering dispute over a six-story building in Manhattan's Flatiron district lies in the application of a basic tenet of contract law: the best evidence of the parties' intent is memorialized in their written agreement. The specific

question arising in this action is whether the defendant landlord agreed to sponsor the conversion of its building to condominium use. The plaintiffs concede that there is no provision in the lease that obligates the landlord to do so. However, they claim that the obligation is implicit. Moreover, they claim that, without the conversion of the building, the tenant (one of the plaintiffs) cannot realize any revenue from it, and hence is unable to pay the rent or any incidentals due under the triple-net lease.

For the reasons set forth below, we find that the plaintiffs' argument is without merit. The defendant's alleged breach of a nonexistent provision does not excuse the tenant's undisputed breach of the lease where the tenant's obligation to pay rent is unconditional.

The plaintiffs are 3 West Development LLC, and Magen David of Union Square Synagogue and the Sixteenth Street Synagogue (both hereinafter referred to collectively as the synagogues). Steven J. Ancona, leader of the Magen David synagogue, is the third-party defendant and appellant. The defendant/third-party plaintiff is 3 West 16th Street, LLC (hereinafter referred to as the landlord or 3 West 16th LLC) whose principal, John Braha, purchased the building at 3 West 16th Street from nonparty National Council of Young Israel (NCYI). NCYI had owned the building since 1945 and provided space for the Sixteenth Street Synagogue, and subsequently for Magen David (an orthodox group of Sephardic Jews).

In or around 1999, NCYI's attempt to sell the building to a developer gave rise to protracted litigation after the synagogues were asked to vacate the building. In early 2005, Mr. Ancona proposed that the two synagogues settle the litigation with NCYI by raising funds to jointly purchase the building through an entity Mr. Ancona controlled, 3 West 16th LLC (now the defendant/third-party plaintiff). Mr. Ancona proposed that 3 West 16th LLC would convert the building into a condominium, renovate it, sell the top four floors as apartments to pay off third-party financing, and donate the basement and the first and second floors, along with any profits, to the synagogues. The synagogues accepted Mr. Ancona's proposal.

Subsequently, Mr. Ancona sought third-party financing for approximately $10 million by issuing an offering to potential investors for the purchase of limited partnership interests in 3 West 16th LLC. The offering specified that Mr. Ancona's company, Flatiron Real Estate Advisors LLC, would act as the

managing member and project manager to convert the building to condominium use and renovate and sell the top four floors as luxury apartments, so that the basement and the first and second floors would be deeded to the synagogues.

Mr. Ancona eventually negotiated a deal with a sole investor, John Braha, who, in order to take advantage of Internal Revenue Code (26 USC) § 1031, negotiated to acquire the building outright using the sale proceeds of another building. To qualify for such an exchange, the entity that acquired the interest in the building had to be owned and controlled by the taxpayer, Mr. Braha. Therefore, Mr. Ancona, as principal and sole owner of 3 West 16th LLC which held the purchase rights, agreed that Mr. Braha could assume ownership and control of 3 West 16th LLC in order to make the purchase. Upon purchase, 3 West 16th LLC would then lease back the building for development by 3 West Development LLC, another entity owned and controlled by Mr. Ancona.

On March 24, 2006, NCYI deeded the building to 3 West 16th LLC with Mr. Braha as its principal. On the same date, 3 West 16th LLC, as landlord, entered into a 35-year lease with 3 West Development LLC (hereinafter referred to as the tenant). In addition to executing the lease on behalf of the tenant, Mr. Ancona also executed a guaranty and indemnity agreement in which he personally guaranteed the obligation of the tenant under the lease.

Pursuant to the 35-year lease, the following terms, in relevant part, were agreed to by the landlord and the tenant:

(1) The landlord would fund up to a maximum of $2,850,000 for pre-approved alterations. These are listed in exhibit C to the lease, and include the floor plans for all the floors from basement to 6th floor with the note that "[a]ll work therein and related contracts, demolition, construction and renovation are included within the [p]re-[a]pproved [a]lterations." Exhibit C includes a preliminary construction budget of approximately $2.7 million for the renovation of only four floors, and budgets prepared by Mr. Ancona to reflect the "possible" donations of the basement and the first and second floors of the building. The pre-approved alterations include the hiring of all contractors and subcontractors; the filing of all development and condominium plans and permits; and the marketing and sale of units in the building.

(2) The tenant was to have sole responsibility for implementation, supervision and completion of the retrofitting of the build-

ing including obtaining all necessary approvals for permits and licenses, and "caus[ing] the [c]onstruction of the [p]re-[a]pproved [a]lterations to be [c]ompleted with diligence and continuity." Continued construction was required in order for the tenant to maintain its entitlement to disbursements from the fund.

(3) Pursuant to article 9.5, the landlord agreed to cooperate in furthering any of the pre-approved alterations by executing required documents and taking reasonable action.

The lease contemplated that the landlord would recoup its equity in the building (purchase price and advances for alterations) together with 10% rate of return on investment, compounded annually, and accruing from the commencement date of the lease. Article 33 of the lease contemplated that the landlord would be paid the net proceeds from the sale of each unit until all the equity and interest were paid.

As of January 2008, however, whether or not there was income being produced through sales or subleases, repayment was to commence through a monthly rental of approximately $99,000 per month. The tenant was obligated to pay rent until such time as rent and/or income from sales or subleases satisfied the landlord's return on investment. Thereafter, the net proceeds from the sales of the units were to be split 55:45 between the landlord and the tenant, respectively, and the landlord would release the space being sold from the lease.

Accordingly, the tenant had a two-year grace period while alterations and renovations were in progress in the building. By its terms, the lease was to terminate the earlier of April 1, 2041 (35 years after commencement), or when releases had been issued for "all of the premises."

The record reflects that the relationship between the landlord and the tenant soured in mid-2007 when the landlord declined to sign a preliminary application for condominium conversion. Mr. Braha averred that he declined to sign the "condominium offering plan" because it "omitted and misrepresented material facts" regarding the long-term lease of the property. He also informed the tenant that as "a dealer of condominiums" he would have a greater tax liability.

Allegations in the verified complaint and counterclaims point to a subsequent swift deterioration of the relationship. The landlord alleges that the tenant was using a portion of the advances to pay for construction work in the basement and first

two floors, which he claims was not in accordance with pre-approved plans, and that the tenant allegedly instructed its contractors to abandon their work in December 2007. The tenant alleges that the landlord refused to advance a requested installment of approximately $200,000 from the pre-approved alterations fund in December 2007. However, none of these allegations are substantiated in the record.

What is undisputed is that the tenant failed to pay the first rent installment due by January 20, 2008 and subsequently failed to pay rent in February and March. This gave the landlord the right to terminate the lease 30 days after issuing a notice of termination. However, the landlord allowed the rent to be paid beyond the grace periods in January, February and March. The tenant admittedly has paid nothing since then. The tenant has also failed to pay any of the insurance or taxes it was obligated to pay under the lease. Also undisputed is that the landlord withheld the disbursement of an advance from the pre-approved alterations in February 2008.

In that same month, the synagogues and the tenant (hereinafter collectively referred to as the plaintiffs) commenced this action to quiet title to the three lower floors of the building, and to enforce the landlord's promise to donate the floors to them. The plaintiffs asserted causes of action, inter alia, seeking a declaratory judgment that the landlord had breached its funding obligations; and that the landlord's refusal to cooperate in the condominium conversion excused the tenant's obligation to pay rent under the lease.

The landlord filed an amended answer and counterclaims. It asserted breach of contract by the tenant for the failure to pay rent, and for the failure to complete pre-approved alterations. The landlord sought a declaratory judgment that the lease had been terminated by the tenant's failure to pay rent. It also sought to recover possession of the building by ejecting the tenant for default under the lease. It also commenced a third-party action against Mr. Ancona for indemnification.

In May 2008, the landlord served the tenant with a notice of lease termination for failure to pay rent. Further, on August 25, 2008, the landlord moved for an order, pursuant to Real Property Law § 220, awarding use and occupancy, or alternatively, sole possession of the building. This motion remained pending in February 2009 when the landlord moved for summary judgment dismissing the complaint, and for judgment on its counterclaims and third-party claims against Mr. Ancona.

By order dated January 11, 2010, the court granted the landlord's motion for summary judgment to the extent of dismissing the plaintiffs' causes of action in breach of contract and enforcement of a charitable gift, and declaring that the landlord has a fee simple interest in the building; that the synagogues do not possess any equitable ownership interest in the building; and that the tenant's leasehold interest was legally terminated 30 days after service of the landlord's May 8, 2008 notice of termination. The court also granted summary judgment on the landlord's third-party complaint against Mr. Ancona.

On appeal, the plaintiffs argue that the motion court erred because factual issues exist which preclude a grant of summary judgment to the landlord. They argue, as they did before the motion court, that the landlord frustrated the agreement's objective by reneging on its promise to submit an offering plan for condominium conversion to the State Attorney General, and by advancing only $2,710,973.95 of the $2,850,000 in pre-approved alteration funding. Moreover, they argue that such failure of performance interfered with the tenant's ability to timely pay the rent due by depriving it of condo sales that were contemplated as the source of loan repayment. The plaintiffs further argue that the lease precluded the tenant from subleasing to generate income.

We now affirm the motion court's order in its entirety. The landlord is correct in asserting that the plaintiffs are not asking this Court to interpret the contract, but rather are seeking to rewrite it. The landlord relies on *Vermont Teddy Bear Co. v 538 Madison Realty Co.* (1 NY3d 470 [2004]) to assert the impermissibility of inserting new terms and obligations where the language of a lease is clear and unambiguous as it is in this case. Moreover, we agree that the plaintiffs' arguments are refuted by the plain language of the lease.

There is no question that article 33 of the lease and exhibit C reflect a clear intent of the parties to renovate the top four floors of the building into luxury apartments. The lease also contemplates the possibility of a conversion of the building to condominium or cooperative ownership use, but it does not mandate such conversion. Nor could it, given that such conversions are subject to approval by the State Attorney General.

More significantly, there is no specific provision in either the lease or the attached incorporated exhibits that requires the landlord to pursue a condo conversion by preparing, signing or

submitting an offering plan with the Attorney General. In other words there is no provision that obligates the landlord to sponsor the conversion. Indeed, the word, "sponsor" does not appear at all in either the lease or exhibits.

The plaintiffs concede as much, but argue that a triable issue of fact is raised as to the landlord's obligation under the lease since it requires him to *cooperate* in the condominium conversion of the building. The plaintiffs point to article 6.2 which states, in relevant part, that "[l]andlord agrees to reasonably cooperate with tenant . . . , and to execute any documents necessary in order for Tenant to obtain said approvals, permits and/or licenses." They also rely on article 9.5 which states: "Landlord agrees to execute such documents, take such reasonable action and cooperate in all respects . . . to further any alteration, including the [p]re-[a]pproved [a]lteration." As the plaintiffs correctly state, pre-approved alterations include the filing of all development and condominium plans and permits. Thus, they assert that it is implicit in the lease that the landlord must *sponsor* the conversion.

However, the plain language of article 9.5 clearly excuses the landlord's cooperation in executing documents or taking action where "such action would broaden his obligations hereunder." Given the landlord's unrefuted assertion that he would incur a greater tax burden as a result of becoming "a dealer of condominiums," his refusal to act as sponsor is a bargained for right under the lease rather than a breach of that agreement.

None of the essential and material terms for an agreement to pursue a condominium conversion are provided for in the lease. The lease does not specify what is to be included in the offering plan, or when such plan should be filed, or even whether the building will be a condominium or cooperative. Where such material terms are left for future negotiation, the requirement that the landlord pursue the condominium conversion is unenforceable. (*See e.g. Joseph Martin, Jr., Delicatessen v Schumacher*, 52 NY2d 105, 109-111 [1981].)

Moreover, even looking beyond the four corners of the lease, as the plaintiffs urge, does not help them. The plaintiffs argue that the record demonstrates that conversion of the building to condominium use was fundamental to the parties' bargain. The plaintiffs direct us to review the record, which purportedly establishes that "3 West [16th LLC], which was then owned by Mr. Ancona, had repeatedly promised the [s]ynagogues that it would convert the [b]uilding into a condominium and give the

[s]ynagogues quiet title to their floors . . . [and] that Mr. Braha was familiar with the promises made by 3 West [16th LLC] to the [s]ynagogues regarding their floors."

They further urge this Court to consider that this dispute has arisen "from efforts by the [plaintiffs] to preserve the [s]ynagogues' home in the building. The [s]ynagogues . . . and Mr. Ancona were not interested in making a profit."

Unfortunately for the plaintiffs, this indicates only that Mr. Ancona's purported generosity was to be funded solely out of Mr. Braha's pocket. What the record, in fact, demonstrates is that neither Mr. Ancona nor the synagogues contributed to the purchase of the building. Mr. Braha, through 3 West 16th LLC, assumed the financial risk of purchasing the building. While there was no evidence that Mr. Braha had a personal interest in the synagogues' continued existence at the subject property, he, nevertheless, allowed the synagogues to remain in the building for the first two years on a rent-free basis.

Thus, the plaintiffs' assertion that "[the] conversion of the [b]uilding to a condominium was part of Mr. Ancona's plan from the beginning," is relevant only to the extent that it establishes that indeed it was Mr. Ancona's plan, not Mr. Braha's. Moreover, in the beginning, as the record shows, the original plan contemplated that Mr. Ancona would become a managing member of the entity that purchased the building. As such, any obligations to prepare and file an offering plan for conversion would lie with him. The plaintiffs cannot simply transpose Mr. Ancona's intentions, good wishes and aspirations onto the landlord as enforceable obligations.

Moreover, to the contrary, the record supports the view that the landlord never contemplated sponsoring a condominium conversion. In an e-mail to Mr. Ancona, dated May 8, 2007, Mr. Braha acknowledges that the agreement is incomplete insofar as there is "no exit strategy for completing the transactions contemplated by the agreement." He added that he had asked his attorneys to "hatch the exit plan at the later part of 2006 . . . [and] I was really expecting that we would come to an agreement well before now that would have allowed you to sign off on the cps-1." Mr. Braha continued as follows: "So push your side . . . and I'll do the same . . . this way you can get the cps-1 application submitted and get this project moving forward." The record reflects therefore that, at this point, the parties understood that a conversion could go forward without the landlord necessarily acting as sponsor.

█ In any event, the terms of the lease are clear that the tenant's obligation to pay rent as of January 2008 is entirely unconditional. The tenant cannot, and does not, point to any language in the lease that made its rental obligations contingent upon submission of an offering plan by its landlord. Nor is the obligation dependent on the tenant deriving any income from the property.

In fact, the lease specifically obligates the tenant to pay rent in the event that the tenant has *not* received any distributable cash (defined, in relevant part, as "any and all income derived by [t]enant from any use, sublease, sale, assignment, contribution or other transaction whatsoever effecting the [p]roperty"). Thus, the tenant's argument that the landlord compromised the plaintiffs' ability to perform its obligations because of the landlord's refusal to proceed with the condominium conversion is totally without foundation.

The tenant's argument that the only source of income available to it was from condo sales because it was not permitted to sublease any of the space is refuted by the clear language of the lease. Albeit conditioned on the landlord's approval and consent, article 23 contemplates subleases, and even assignment of the lease. Moreover, article 23.5 gives the tenant "the right, one time only, without Landlord's consent, to assign this [l]ease, or sublease all of any portion of [p]remises to any business entities directly or indirectly, controlling, controlled by or under common control by Tenant." There is also, of course, nothing in the lease preventing the tenant from collecting rent from the synagogues.

Again, the tenant's intentions, hopes, and desires for providing a rent-free home for its subtenants, the two synagogues, must be viewed independently of the defendant's rights as owner and landlord of the subject premises. Certainly, there is no language obligating the landlord to donate the basement and two lower floors to the synagogues, or to continue their rent-free status beyond January 2008. Contrary to the plaintiffs' argument, the floor plans in exhibit C do not establish any binding promise of donation on the landlord's behalf. The references to "possible donation" are, as the motion court found, "nothing more than a written expression of Mr. Ancona's aspiration." The fact that the lease terms appear to establish that the landlord's interest in the building continues only so far as its receipt of sale proceeds connected with the building's top four floors is not determinative of an agreement to donate the rest of the building.

Indeed, whatever the *possibility* that the synagogues would eventually benefit by a donation of the lower floors and basement, any such donation was predicated on the tenant's completion of renovations, conversion into luxury apartments, and the tenant's marketing and selling of same. In other words, it depended on the tenant's fulfillment of its obligations under the lease.

Finally, the tenant's argument that its default on the rent over a period of years is excusable because the landlord breached the lease first by refusing to disburse a requested advance from the pre-approved alteration fund is also without merit. There is no evidence of record that the tenant requested disbursements in either December 2007 or February 2008, which requests were to be made in writing. There are no copies of the requested advances appended to Mr. Ancona's affidavit in opposition to the landlord's motion for summary judgment. In any event, the plaintiffs' assertion of a breach of contract claim in its verified complaint specifically relies only on a February 2008 request for funds. Hence, any alleged breach by the landlord in failing to comply with the tenant's request for funds occurred after the tenant's own default in the payment of rent, and after the landlord sent the first notice of termination, dated January 31, 2008.

For the foregoing reasons, the tenant's default under the lease is not excusable. Therefore, the landlord rightfully sent a notice of termination in May 2008, and has the right to recover possession of the premises. Further, we find that the motion court properly granted the landlord's motion for payment of use and occupancy since March 2008, and correctly found that Mr. Ancona had raised no defense to his obligation on the guaranty and indemnity provisions and, as such, properly granted the landlord judgment on its third-party complaint.

Accordingly, the order of the Supreme Court, New York County (Debra A. James, J.), entered July 22, 2010, which, to the extent appealed from, granted defendant's motion for summary judgment dismissing the fourth, fifth and sixth causes of action; declared, upon the first, second, third, seventh and eighth causes of action, that (1) defendant has a fee simple interest in the subject property; (2) plaintiffs possess no equitable ownership interest in the property; and (3) plaintiff 3 West Development LLC's leasehold interest was legally terminated 30 days after defendant served its May 8, 2008 Notice of Termination; and granted summary judgment on defendant/

third-party plaintiff's first, second, fourth and sixth counter-claims and on its third-party complaint, should be affirmed, with costs.

SAXE, J.P., SWEENY, FREEDMAN and ROMÁN, JJ., concur.

Order, Supreme Court, New York County, entered July 22, 2010, affirmed, with costs.